181 So.2d 384

### Succession of Thomas Charles MULQUEENY.

### Nos. 47709, 47710.

Dec. 13, 1965.

Rehearings Denied Jan. 17, 1966.

Felix O. Rousset, New Orleans, for applicants in No. 47709.

René R. Nicaud, A. E. Blackmar, New Orleans, for applicant in No. 47710.

George E. Konrad, Harry Nowalsky, New Orleans, for respondent in Nos. 47709 and 47710.

SUMMERS, Justice.

This litigation involves the interpretation of certain legacies in the last will and testament of Thomas Charles Mulqueeny who departed this life on May 16, 1962.

Decedent's last will and testament is in nuncupative form and makes no mention of his one forced heir, a daughter, Mrs. Mary Mulqueeny Prieto. The will, dated July 5, 1958, insofar as it is pertinent to this litigation, reads as follows:

"I leave the property, numbers 4513 and 4515 Eden Street, in the City of New Orleans, Louisiana, to Dorothy Blackmar, my cousins daughter. I also leave her five thousand ($5,000.00) dollars cash.

"I leave five thousand ($5,000.00) dollars, cash, to Alicia Blackmar, widow of E. T. Anderson.

"I leave five thousand ($5,000.00) dollars, cash, to Margaret (Margie) Blackmar. Both of the latter are also daughters of my deceased cousin, Katherine Kelly Blackmar."

\* \* \*

"I also leave to the said Anna Elizabeth Early any and all Homestead Stock, or any interest I may have therein, in the following named Building & Loan Associations:

"1. Eureka Homestead Society, 2. Fidelity Homestead Association, 3. First Homestead and Savings Association, 4. Hibernia Homestead & Savings Association, 5. Home Building and Loan Association, 6. Homestead Savings Association, 7. Security Building and Loan Association, 8. Union Savings and Loan Association. I revoke all former wills ever made by me.

"I leave anything else, property or other assets, that I may die possessed of, to the said Anna Elizabeth Early and appoint her Executrix of my will and Estate, with seizin and without bond.

"I appoint Augustus G. Williams attorney at law to handle my succession and the execution of this will, according to law."

Decedent's estate consists of real estate valued at $48,200, United States Savings Bonds valued at $9,293.77, Homestead Savings Accounts valued at $46,500 and a small amount of cash ($167.20), jewelry ($1.00) and YMGA stock ($30.00).

The United States Savings Bonds mentioned above were payable on death to Miss Early, but, although they are to be fictitiously added to the estate to calculate the legitime, they are not otherwise part of the estate.

The Blackmar legatees, as the will recites, are cousins of the testator. Miss Anna E. Early, the other legatee, is unrelated. The decedent's daughter, Mrs. Prieto, intervened, claiming her legitime as the will disposed of all of the testator's property.

At the outset, Mrs. Prieto sought to have Miss Early removed as testamentary executrix because of alleged conflicts of interest and other charges. The trial court sustained this contention and discharged the executrix. However, on appeal to the Fourth Circuit this judgment was reversed (156 So.2d 317). Miss Early was accordingly reinstated as testamentary executrix and ordered to proceed with the settlement of the succession.

This contest developed in connection with the settlement when an opposition was filed by the Blackmar legatees and Mrs. Prieto, the forced heir, to the provisional account and proposed tableau of distribution filed by Miss Early as executrix.

The opposition of the Blackmar legatees, with which we are concerned, is based upon

the fact that the tableau of distribution filed by the executrix did not recognize the cash legacies of $5,000 to each of them. They assert that these legacies, inasmuch as there is no cash to satisfy them after payment of the succession debts and the withdrawal of the United States Savings Bonds, are payable out of the homestead accounts. It is argued that the homestead accounts are, in reality, nothing more than "cash" in legal contemplation and are available to satisfy the legacies to the Blackmar sisters; and Miss Early, under the will, is the residuary legatee of the balance after the legacies to the Blackmar sisters are satisfied.

On the other hand, the contention of Miss Early, as executrix and legatee, is that these homestead holdings were "stock" and by the language of the will she is a particular legatee of "any and all" of the homestead *stock*, "or any interest * * * therein." Article 1635 [1] of the Civil Code, she says, requires that the legacy to her, because it is one of a "certain object," must first be discharged before legacies of money can be discharged. Hence, as there was no cash in the estate to speak of, and because she is the legatee of all of the homestead stock, there is nothing from which the Blackmar legacies can be satisfied; therefore, ademption of those legacies took place.

The trial court denied the contention of Miss Early, the executrix, and allowed the legacies to the Blackmar sisters. On appeal the Fourth Circuit reversed (172 So. 2d 326). That court was of the opinion that the problem presented was not one of ambiguity in the testament, but one merely of inadequate assets to discharge all of the unambiguous particular legacies. It therefore held that Article 1635 was controlling and Miss Early's legacy of the named homestead stock "cannot be affected by the other legacies which are for money." The effect of this adjudication was to decree the ademption of the legacies to the Blackmar sisters as there was no cash to satisfy them —all in keeping with Miss Early's contention.

We granted writs to review the foregoing judgment.

As we have noted, Miss Early contends that the legacy to her of "any and all Homestead Stock, or any interest I may have therein" is a legacy of a certain object and under the authority of Article 1635 of the Civil Code it must be taken out first. This result would leave nothing for the satisfaction of the Blackmar legacies.

■ This contention, however, is without merit. Such a legacy, under the authority

1. "If the effects do not suffice to discharge the particular legacies, the legacies of a certain object must be first taken out. The surplus of the effects must then be proportionately divided among the legatees of sums of money, unless the testator has expressly declared that such a legacy shall be paid in preference to the rest, or that the legacy is given as a recompense for services." La.Civil Code art. 1635.

of Succession of Berdon, 202 La. 607, 12 So.2d 654 (1943) is not a legacy of a certain object for there is no legacy of a "definitely designated certificate of stock," which is the requirement of certainty established by the Berdon decision when stock is the object involved. Moreover, the plain language of the will reveals the uncertainty in the bequest of "Homestead Stock" when the testator referred to "any interest" he might have therein. This reference is definitely not certain—not even as to the quantity involved. It could, under some circumstances, refer to nothing where the testator had "*no* interest" therein. Furthermore, the position Miss Early would have us adopt requires the finding of a violent and irreconcilable conflict between the disposition in her favor and the dispositions in favor of the Blackmar sisters—a result the testator could not in reason have intended. We do recognize, however, that the apparent contradictory dispositions create an ambiguity which must be reconciled.

The shares or stock owned by the decedent in the various building and loan associations referred to in the will were, in the main, designated as optional payment shares. Such shares are essentially nothing more than funds deposited with the association at interest, subject to withdrawal at any time upon presentation of the account book issued to the depositor. These homestead accounts were opened by the decedent jointly in his name and Miss Early's name, for they were long-time friends and companions, and she attended to most of his affairs in his later years. Joint accounts made it convenient for Miss Early to pay decedent's hospital, doctor and household bills without the necessity of his signature, and she did pay decedent's bills with cash withdrawn from these accounts. She also deposited cash collected by her from rentals due decedent during his lifetime. The accounts were, therefore, used by decedent much as bank accounts would be used, for decedent had no bank accounts. Other than the homestead accounts mentioned in the will, decedent had no accounts in his name at the time of the making of the will and until his death.

■ This type of building and loan "stock" or "shares" has been characterized by this court as "merely a deposit of a sum of money at a fixed rate of interest, the principal and interest being all subject to withdrawal at any time." Succession of Homan, 202 La. 591, 605, 12 So.2d 649, 653 (1943). See also Dimitry v. Shreveport Mutual Bldg. Assn., 167 La. 875, 877, 120 So. 581, 582 (1929). Thus the reference to "cash" in the legacies to the Blackmars does not necessarily require that those legacies be satisfied strictly from physical currency, coin or specie, but "cash" in that sense could contemplate the satisfaction of the legacies from demand deposits, or choses in action represented by a bank or other

account when the funds represented thereby are subject to ready withdrawal.

■ It must be borne in mind that in reading this will, as in all others, we are primarily concerned with ascertaining the intention of the testator without departing from the proper signification of the terms of the testament. La.Civil Code art. 1712. And dispositions in wills must be understood in the sense in which they can have effect, rather than that in which they can have none. La.Civil Code art. 1713. In ascertaining the intention of the testator "the language of the will is generally to be understood in the ordinary popular meaning and without attending so much to the niceties of rules of grammar." Succession of Price, 202 La. 842, 13 So.2d 240 (1943). See also Succession of Villa, 132 La. 714, 61 So. 765 (1913).

■ With these principles in mind, considering the fact that testator had no readily available funds at the time when he made his will other than the homestead stock, and that he made no attempt to provide funds to satisfy the legacies to the Blackmar sisters prior to his death (almost two years later) other than the homestead stock, we must conclude that it was his intention that these bequests of cash could be and would be satisfied from that source—his only source of readily available funds. Succession of Tertrou, 217 La. 901, 47 So.2d 681 (1950); Succession of Levy, 207 La. 1062, 22 So.2d 650 (1945).

■ Once this intention is ascertained it becomes evident that the reference to "any and all Homestead Stock, or any interest I may have therein" meant that Miss Early was to receive all of the homestead stock, that is, any interest left therein after the satisfaction of the cash legacies to the Blackmar sisters or the other cash requirements of the succession. La.Civil Code art. 1716.

It would be extraordinary and uncommon for a testator to make three substantial legacies in a will, as was done here, and in the same will revoke those bequests. The bequests to the Blackmar sisters, who are blood relatives of decedent, occupy too prominent a role in the decedent's will to permit such a result unless such an intention is expressed and unequivocal. It is neither here. Such a result can only be reached by inference from the fact that the bequest to Miss Early came last in the same will and, as the last expression of the testator, it amounts to a revocation of the preceding bequests to the Blackmar sisters. Miss Early urges us to make this inference relying upon the authority of Article 1723 of the Civil Code.

■ Such an inference might properly be invoked if the bequest to Miss Early had been made at a later date in a separate instrument or in a codicil to the will. That factual difference might then be an important influence in ascertaining the testator's intention. But we cannot subscribe to

her argument in this case when the apparently contradictory dispositions were, in effect, executed simultaneously and appear in the will back to back. This testament clearly manifests an intention to bequeath $5,000 to each of the Blackmar sisters and this court must, under our law, give effect to that intention. No violence is done to the true signification of the language of the testament by this result. By this solution bequests to all legatees are recognized and given some effect, rather than giving no effect to the three substantial bequests to the Blackmar sisters under a contrary decision. La.Civil Code art. 1713.

The result thus far reached presents one other question urged in the application for writs which we granted. The question is: Who is to contribute to the payment of the debts of the succession and to the satisfaction of the legitime due the forced heir?

Though we cannot agree that the bequests of homestead stock to Miss Early was a bequest of a certain object which should be taken out before the satisfaction of the particular legacies to the Blackmar sisters under Article 1635 of the Civil Code, the bequest to Miss Early is nevertheless a particular legacy of those homestead funds remaining after the satisfaction of the cash bequests to the Blackmars.

Miss Early was also sought to be made residuary legatee under the will by this clause: "I leave anything else, property or other assets, that I may die possessed of, to the said Anna Elizabeth Early and appoint her Executrix of my will and Estate with seizin and without bond." This bequest, however, is ineffectual for virtually the entire estate of decedent is consumed by particular legacies.

■ Inasmuch as the entire estate was disposed of by legacies, none of which is entitled to preference by declaration of the testator, and as these dispositions exceed the disposable portion, all legacies, save those of certain objects, must be reduced pro rata to pay the debts and satisfy the legitime. La.Civil Code arts. 1511, 1512 and 1635.

The judgment of the Court of Appeal, insofar as it is in conflict herewith, is reversed; it is otherwise affirmed. The case is remanded to the district court to be proceeded with in accordance with the reasons herein assigned.

McCALEB, Justice (dissenting).

I agree with the views of the Court of Appeal (see Succession of Mulqueeny, 172 So.2d 326.) In Succession of Price, 202 La. 842, 13 So.2d 240, the Court said:

"The true rule in the interpretation of testaments is that 'the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament.' Civil Code, Article 1712; Succession of Mc-Burney, 165 La. 357, 115 So. 618; De-

laureal v. Roguet's Succession, 177 La. 815, 149 So. 464. And, to ascertain that intention, the language of the will is generally to be understood in its ordinary popular meaning and without attending so much to the niceties of rules of grammar. Penny v. Christmas, 7 Rob. 481; Hasley v. Hasley, 25 La. Ann. 602."

By applying this rule to the instant case, the resolution seems inescapable that the cash bequests to the three nieces of the testator cannot rightly be paid out of the proceeds derived from the homestead deposits for the testator, by specific and unequivocal language, bequeathed these homestead deposits to Miss Early.

It matters not, in my opinion, that the testator's bequest of his interest in the joint homestead accounts standing in the name of the testator and Miss Early are not to be considered, under Succession of Berdon, 202 La. 607, 12 So.2d 654, as a gift of a particular object. Suffice it that, by the same authority, it is a legacy by a particular title —for this is all that it necessary to bring it within the codal rules governing particular legacies. See Articles 1605 and 1625 through 1643 of the Civil Code.

Under Article 1625, every legacy, not included in the definitions of universal legacies and those under a universal title, is a legacy under a particular title. And Article 1626 declares that the legatee under a par-

ticular title acquires the right to the thing bequeathed from the date of the testator's death, which right may be transferred to his heirs and assigns. Thus, in the case at bar, regarding the legacy of the homestead stock as a gift of the deposits in the homesteads named in the will, it is clear under the law that Miss Early, as a particular legatee, became vested with an unencumbered right to these deposits at the moment of the testator's death.

This was the clear intent expressed in the testator's bequest and I can find no sanction in law for the Court's refusal to honor it. True, it is regrettable that the three nieces, who were each willed $5,000 cash, cannot derive it from the corpus of the estate because there are no funds left after payment of the debts to discharge these legacies. But this unfortunate circumstance does not warrant the Court's holding that these legacies must be paid out of the homestead deposits which were unconditionally and unequivocally bequeathed by a *particular title* to Miss Early.

In attempting to justify its action herein, the majority apparently conclude that, since there is no cash available to pay the legacies to the decedent's nieces, there is something ambiguous about the will and that the testator surely intended that his nieces would receive his bequest. There is no doubt, of course, that the testator expected that he had or would leave at his death sufficient funds over and above his debts to pay these

legacies. But the fact that there were not sufficient funds in the succession, apart from the legacy by a particular title to Miss Early of the homestead deposits, to discharge the legacies to the nieces does not supply a logical predicate for the deduction that the language of any of the bequests contained in this will is ambiguous or justify the conclusions (argumentative at best) that the testator intended that his nieces be paid out of the particular legacy of his interest in the homestead deposits in favor of Miss Early. The testator did not say so and the resolution that this was his intent is rank speculation. My *guess*, from a reading of the will, is that his closest ties were with Miss Early and, if he could come back to announce his desires which he clearly set forth in his will, he would give her preference in all matters pertaining to his worldly goods.

In conclusion, I submit that the decision herein constitutes a re-writing of explicit and unequivocal bequests to conform with the Court's conception of equity. This, I do not believe we have the right to do. Consequently, I respectfully dissent.

PER CURIAM.

In two of the three applications for rehearing filed herein our attention has been directed to the fact that the majority opinion on the original hearing contained the clerical error that "Decedent's estate consists of * * * Homestead Savings Accounts *valued at $46,500* * * *". As is shown by the inventory contained in the record the proper valuation of those accounts was $60,052.18. Therefore, the mentioned clerical error in the opinion is hereby corrected so as to disclose the proper valuation. (Italics ours)

All three applications for rehearing are denied.

McCALEB, J., dissents from the refusal of Miss Early's application.